**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| | **:** | |
| **ANDREW KORTYNA,** | **:** | **CIVIL ACTION** |
| **Plaintiff,** | **:** | |
| | **:** | |
| **v.** | **:** | **No. 14-2092** |
| | **:** | |
| **LAFAYETTE COLLEGE and** | **:** | |
| **WENDY HILL,** | **:** | |
| **Defendants.** | **:** | |

## M E M O R A N D U M

**Stengel, J.**                                    **September 19th, 2014**

Dr. Andrew Kortyna, a Lafayette College professor, brought this suit against the College and its former Provost after his request to have his attorney represent him at a school disciplinary hearing was denied. Two students have accused him of sexual harassment. These accusations allegedly caused him to develop debilitating anxiety and depression. Dr. Kortyna believes he cannot represent himself at his disciplinary hearing on these charges because of his mental and emotional condition. The defendants moved to dismiss the complaint under Rule 12(b)(6). For the reasons stated below, I will grant their motion and dismiss the complaint in its entirety.

## I.      BACKGROUND[1]

Lafayette College is a private liberal arts college in Easton, Pennsylvania that receives federal funding. Dr. Andrew Kortyna is a tenured physics professor at Lafayette.

---

[1] The alleged facts in this section are taken from the First Amended Complaint corrected (Doc. No. 11), unless otherwise noted.

He received his Ph.D. in physics in 1993 and began teaching at Lafayette in 2001. Defendant Wendy Hill was the Provost of Lafayette College at the time the plaintiff filed his complaint. She left Lafayette to become the head of The Agnes Irwin School in Rosemont, PA on July 1, 2014.

### a. Student Accusations against Dr. Kortyna

On September 26, 2013, a senior at Lafayette College—student W—filed a complaint with Provost Wendy Hill accusing Dr. Kortyna of sexually harassing her.[2] On October 2, 2013, Provost Hill telephoned Dr. Kortyna to inform him that a student complaint had been filed against him. She did not provide him with more specifics and told him that she had no documentation. The plaintiff alleges that she did, in fact, have more information and documentation at the time of this call.

On October 3, 2013, another student—student B—filed a one-sentence complaint of sexual harassment against Dr. Kortyna. This student is allegedly a close friend of student W. On October 4, 2013, Dr. Kortyna "apologized to B for anything he might have done to upset her" during a conversation that "lasted about less than a minute and took place in public in front of the Hugel Science Center which houses Andrew Kortyna's office and laboratory, and all physics labs and classrooms." Several dozen people were within 100 feet of the two.

On October 7, 2013, Dr. Kortyna was given the student complaints, which were later amended. The complaints he received were short and offered no factual explanation

---

[2] Allegedly, this same student also filed complaints against other faculty and staff.

or description. Student W alleged that he had harassed her for nearly two years, while student B claimed he had harassed her for several months.

On November 6, 2013, Provost Hill informed Dr. Kortyna that she had rejected student B's complaint but not student W's complaint. Over the next several weeks, Provost Hill allegedly "pressured" Dr. Kortyna to agree to be dismissed from the College. Allegedly, Provost Hill indicated that his agreement to be dismissed from the College would halt the investigations against him. On December 17, 2013, Provost Hill issued two investigative reports. One found possible merit in student W's accusations. The other found that Dr. Kortyna did not harass student B but may have retaliated against her for filing her complaint, based on his conversation with her on October 4, 2013.

On January 3, 2014, Professor Robert Cohn, Chair of Lafayette College's Appeal and Grievance Committee, informed Dr. Kortyna that a hearing committee was being formed to hear the two student complaints. On February 3, 2014, Professor Cohn informed Dr. Kortyna that the Lafayette College Hearing Committee had been formed and the hearing would occur within 21 days. On February 12, 2014, the Lafayette College Hearing Committee then informed Dr. Kortyna that the hearing dates were set for March 5, 2014 and March 6, 2014.

### b. Dr. Kortyna's Mental Health Condition

As a result of the complaints made against him, Dr. Kortyna began to experience anxiety attacks and bouts of depression. On October 5, 2013, he collapsed, "was sobbing," and "incoherent." His primary care doctor prescribed him anti-anxiety medication. He had never taken any psychiatric medication before this in his life. On

October 23, 2013, Dr. Kortyna suffered another anxiety attack and was prescribed anti-depressant medication by his doctor. Over the next several months, Dr. Kortyna continued to have debilitating attacks, and his medication was increased.

On November 27, 2013, Dr. Kortyna began therapy with psychologist Dr. Robert Chupella for treatment of what he described as a "nervous breakdown" caused by the stress of the unfounded harassment allegations. He was eventually diagnosed with Major Depressive Disorder, Single Episode, Severe without Psychotic Features (DSM Axis I, 296.23), and Panic Disorder without Agorophobia (DSM Axis I, 300.01).

On January 31, 2013, he was evaluated by Dr. Kenneth Weiss, a forensic psychiatrist, at the request of his attorney.[3] Dr. Weiss was specifically retained to offer an opinion of whether Dr. Kortyna would be able to handle the stress of the upcoming disciplinary hearing.[4] Dr. Weiss' opinion stated that "Dr. Kortyna, due to his mental condition, would not be able to function at his best" and advised that he be permitted to have legal counsel present at his disciplinary hearing because he may not be able to "retain sufficient control of his thoughts and feelings to perform adequately." Dr. Weiss indicated that Dr. Kortyna might be impaired in speaking before a group that would include his accusers; however, "[w]riting is something he can still do."[5] Dr. Weiss'

---

[3] See First Am. Compl., Doc. No. 11, Ex. A at 2 (Letter of Dr. Weiss to David Ferleger, Esq., Feb. 4, 2014)("Due to Dr. Kortyna's mental condition, you have asked for my opinion as to whether he would have the capacity to present a defense for himself without your presence.").

[4] See id. at 4 ("You have asked whether he would be able to withstand the stress of the anticipated 'trial' such that he would retain sufficient control of his thoughts and feelings to perform adequately. In my opinion, he would not.").

[5] See id. ("Writing is something he can still do, he said, but the problem would be if he had to speak before a group that included the two students and others who had not yet been named. Though he was aware that he had the right to

evaluation noted that the "eye contact" of Dr. Kortyna's accusers "made him very nervous."[6]

Dr. Weiss diagnosed him with depression and anxiety. Dr. Weiss and Dr. Chupella noted that his condition involved serious impairment, "[t]hough he [was] not disabled from his ordinary teaching duties." He only missed one day of work during this period but began having difficulty concentrating and working on his research.[7] He was unable to prepare for an upcoming lecture he was scheduled to give in Colorado because he had a panic attack.[8]

### c.  Lafayette's Disciplinary Procedure for Faculty Members

Allegations of sexual harassment against members of the faculty should be made to the Provost of Lafayette College.[9] The Provost is then responsible for conducting an investigation of the complaint.[10] At the start of the investigation, the Provost should inform the accused faculty member of the applicable policies and procedures, along with a copy of the complaint and the identity of the accuser.[11] The faculty member is then

have peer counsel present, he was quite fearful that he would fall apart and not be able to direct questions at the accusers or to defend himself without feeling out of control.").

[6] See id. ("Dr. Kortyna said that one of the accusers, W, appeared at a school event in November. Although they did not speak, they made eye contact, which made him very nervous.").

[7] First Am. Compl., Doc. No. 11, Ex. D at 1-2.

[8] Id. at 2.

[9] See First Am. Compl., Doc. No. 11, Ex. B at 130 (Lafayette College Policies on Sexual Assault and Sexual Harassment)("Allegations against members of the Faculty should be made to the Provost. In addition, allegations arising out of the teaching role of any instructor of a course should similarly be made to the Provost.").

[10] Id. at 130, 132.

[11] Id.

given the opportunity to respond.[12] When the investigation is finished, the Provost informs the parties in writing of the outcome. "Possible outcomes of the investigation by the Officer are: (a) a judgment that the allegations are not warranted, (b) a negotiated resolution of the complaint, or (c) a judgment that there is a reasonable basis for concluding that a violation of this policy has occurred."[13]

If a negotiated resolution can't be reached, the Provost shall report her conclusions to the complainant and the accused. "At this stage, the accused may elect to have the Provost resolve the matter by accepting the sanctions recommended by the Provost." The alternative is to have the case presented to a Hearing Committee, which is a group of five disinterested tenured faculty members formed to hear the case.[14]

Faculty disciplinary hearings in front of the Hearing Committee look like court proceedings. According to the policies and procedures outlined in the Lafayette's Faculty Handbook, the Provost is responsible for presenting witnesses and evidence against an accused faculty member. The Chair of the Hearing Committee presides over the proceedings like a judge, ensuring that there is a fair presentation of all evidence and an equitable treatment of both parties. The accused faculty member is responsible for presenting his/her case. He/she "may be accompanied only by counsel chosen by him/her from the Faculty or Administration of the College," who may provide advice during the hearing.  The proceedings are recorded by a stenographer. The Hearing Committee is

---

[12] Id.

[13] Id.

[14] Id. at 131, 132-33. Essentially, the faculty member should be unbiased and have no ties to either the faculty member (i.e. as a member of the same department) or the students involved.

permitted access to independent counsel but this counsel is not allowed to attend the hearing itself.[15]

After the hearing is held, the Committee deliberates over what was presented and may determine by a preponderance of the evidence if there was a violation of the sexual harassment policy and what sanctions would be appropriate. The findings of the Committee are then reviewed for fairness by the Hearing Review Committee.[16]

### d.  Dr. Kortyna's Disciplinary Hearing

Eventually, the disciplinary proceeding was held on March 25, 2014. Prior to this hearing, Dr. Kortyna requested that his private legal counsel be present at the hearing as an "accommodation" for his mental health condition. The College denied this request. The College did, however, place restrictions on the student complaintants' ability to be at hearing because Dr. Kortyna's inability to function appeared to stem from his being in their presence.[17] The complaintants were only permitted in the hearing during their testimony. Provost Hill allegedly added additional procedures for the hearing, not found in the Handbook, immediately prior to Dr. Kortyna's hearing.[18]

During the hearing, Dr. Kortyna "was unable to cooperate with" his faculty counsel and appeared not to be understanding what his counsel was telling him. Dr.

---

[15] Id. at 133.

[16] Id. at 134-36.

[17] See First Am. Compl., Doc. No. 11 at 22 ("As you know, the Committee has already decided, based on its understanding of the outlined hearing procedures, that the Complaintants should not be in the hearing room except to present their testimony and answer questions."); First Am. Compl., Doc. No. 11, Ex. C.

[18] It is unclear from the complaint what exactly these additional procedures were.

7

Kortyna's cross examination of W's boyfriend "resulted in an intemperate exchange, and a recess called by the Committee Chair." The hearing was not completed that day.

The following day, Dr. Kortyna requested in writing that the hearing be discontinued "to permit [his] lawyer to work this out with the College's lawyer or for the federal court to rule on an urgent basis" regarding his claims under the ADA. In that written statement, Dr. Kortyna claimed he could not "concentrate" or "engage" in the hearing because he "could not control [his] temper" and was "disoriented, frustrated and angry." He indicated that the most he could do in the hearing would be to "read out loud questions [his] lawyer writes."

### e.  Written Request for Accommodation and Lafayette's Response

On March 28, 2014, Dr. Kortyna was again evaluated by Dr. Weiss. Though he was not having suicidal thoughts, Dr. Kortyna "was thinking of going into a hospital."[19] Dr. Weiss and Dr. Chupulla recommended that he take "a disability hiatus from work."[20] Dr. Weiss again recommended that Dr. Kortyna be permitted the accommodation of his attorney at his disciplinary hearing due to his anxiety, which he labeled as Adjustment Disorder. He analogized Dr. Kortyna's accommodation to "handicap access" or "sensory enhancement."[21]

On April 1, 2014, the Lafayette College Hearing Committee refused to grant Dr. Kortyna's requested accommodation of having his attorney represent him at the hearing.

---

[19] Id.

[20] Id. at 3.

[21] Id.

Instead, the Committee offered the following accommodations: 1) the complaintants will be required to sit on the same side of the table as Dr. Kortyna and to direct their answers to the Committee only so as to "avoid eye contact" with him; 2) Dr. Kortyna may leave the room during the complaintants' direct testimony and may cross-examine them via video or other means, if he is uncomfortable being in the same room as they are; 3) Dr. Kortyna can present written statements from himself and/or other witnesses; 4) Dr. Kortyna can write out questions for direct examination of witnesses that his faculty counsel could read so long as those questions are provided to the Committee first; 5) Dr. Kortyna can cross-examine witnesses after the Committee has asked the witnesses their questions, so that he has time to formulate his cross-examination questions; 6) Dr. Kortyna may ask for a "reasonable break" from the proceedings to be able to prepare cross-examination questions; 7) Dr. Kortyna's faculty counsel could read his cross-examination questions to the witness, if he was unable to do so himself; and 8) Dr. Kortyna's faculty counsel would be permitted to present any other statements that he would like to make after the Committee has reviewed them first, if he felt uncomfortable verbalizing them himself. The Committee and Provost, however, would still be able to verbally cross-examine Dr. Kortyna and his witnesses.

The Committee explained that Dr. Kortyna's request for his personal attorney to be present was not "reasonable" because it "would fundamentally alter the nature of the proceedings and the rights accorded to Complainants and faculty under the Faculty Handbook, and would impose an undue administrative burden on the hearing process."

The Committee's letter requested that Dr. Kortyna let them know if these accommodations were acceptable.

### f.   Dr. Kortyna's Federal Action

On April 10, 2014, the plaintiff filed this suit instead of responding to the Committee's April 1, 2014 letter. The plaintiff alleges that he was unable to speak, think, communicate and participate effectively during the March 25, 2014 session of a disciplinary hearing and will be unable to do so during future hearings. The complaint alleges that Lafayette's "actions are seriously interfering with Professor Kortyna's right to prepare for the hearings to which he is entitled." He claims that Lafayette College has violated Title III of the Americans with Disabilities Act (ADA) and Section 504 of the Rehabilitation Act of 1973. He seeks injunctive relief and a declaratory judgment under both statutes along with attorney's fees and costs, along with damages in a jury trial under Section 504. The plaintiff also alleges a claim of intentional infliction of emotional distress against Wendy Hill. In response, the defendants filed this motion to dismiss.

## II.   STANDARD OF REVIEW

A motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief can be granted examines the legal sufficiency of the complaint.[22] Conley v. Gibson, 355 U.S. 41, 45-46 (1957). The factual allegations must be sufficient to make the claim for relief more than just speculative. Bell

---

[22] In deciding a motion to dismiss, the court should consider the allegations in the complaint, exhibits attached to the complaint, and matters of public record. See Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993). The court may also consider "undisputedly authentic" documents when the plaintiff's claims are based on the documents and the defendant has attached copies of the documents to the motion to dismiss. Id.

Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007). In determining whether to grant a motion to dismiss, a federal court must construe the complaint liberally, accept all factual allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff. Id.; see also D.P. Enters. v. Bucks County Cmty. Coll., 725 F.2d 943, 944 (3d Cir. 1984).

The Federal Rules of Civil Procedure do not require a plaintiff to plead in detail all of the facts upon which she bases her claim. Conley, 355 U.S. at 47. Rather, the Rules require a "short and plain statement" of the claim that will give the defendant fair notice of the plaintiff's claim and the grounds upon which it rests. Id. The "complaint must allege facts suggestive of [the proscribed] conduct." Twombly, 550 U.S. at 564. Neither "bald assertions" nor "vague and conclusory allegations" are accepted as true. See Morse v. Lower Merion School Dist., 132 F.3d 902, 906 (3d Cir. 1997); Sterling v. Se. Pa. Transp. Auth., 897 F. Supp. 893 (E.D. Pa. 1995). The claim must contain enough factual matters to suggest the required elements of the claim or to "raise a reasonable expectation that discovery will reveal evidence of" those elements. Phillips v. County of Allegheny, 515 F.3d 224, 234 (3d Cir. 2008) (quoting Twombly, 550 U.S. at 556).

A court "may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." Brown v. Card Serv. Ctr., 464 F.3d 450, 456 (3d Cir. 2006)(quoting Hishon v. King & Spalding, 467 U.S. 69, 73 (1984)).

### III.   DISCUSSION[23]

### a.   ADA Title III Claim[24]

The plaintiff claims that Lafayette's failure to modify its disciplinary proceedings to allow his attorney to represent him at the hearing was a violation of Title III of the ADA. No exhaustion is required on a Title III claim. See, e.g., O'Shea v. Interboro School Dist., No. 13–cv–06305, 2014 WL 1673237, at *3 n. 4 (E.D. Pa. Apr. 28, 2014)(citing Burkhart v. Widener Univ., Inc., 70 F. App'x 52, 54 (3d Cir. Apr. 21, 2003))(citations omitted); Estrada v. Trager, No. CIV.A. 01–4669, 2002 WL 31053819, at *7 (E.D. Pa. Sept. 10, 2002); Hill v. Park, No. Civ.A. 03–4677, 2004 WL 180044, at *2-3 (E.D. Pa. Jan. 27, 2004); Moyer v. Showboat Casino Hotel, 56 F. Supp. 2d 498, 499 (D.N.J. 1999); McInerney v. Rensselaer Polytechnic Inst., 505 F.3d 135, 138 (2d Cir. 2007) (explaining how Title I requires exhaustion but Title III does not).

Lafayette argues that his claim is more properly brought under Title I of the ADA, which requires that a complaint first be filed with the Equal Employment Opportunity Commission (EEOC). Title I prohibits employers and other covered entities from discriminating against qualified individuals with disabilities in "the hiring, advancement,

---

[23] Jurisdiction over the federal claims against Lafayette College is invoked pursuant to 28 U.S.C. § 1331, the ADA (42 U.S.C. § 12188), and Rehabilitation Act of 1973 (29 U.S.C. § 794a). Jurisdiction over the state law claim is appropriate under 28 U.S.C. § 1367.

Venue is appropriate in this district because the plaintiff and the defendants are located in this district.

[24] The plaintiff argues that this motion should be dismissed because the defendants exceeded the page limit maximum on their brief. In response, the defendants argue that they were granted verbal leave by someone from my chambers. While I typically grant leave to exceed the page limit maximum via written request, I will not dismiss this motion based on that reason. The defendants' actions do not warrant that sort of sanction. Neither efficiency nor justice would be served if I were to dismiss this motion for that reason, especially when the parties had invested substantially time and effort in arguing their points in their briefs.

or discharge of employees, employment compensation, job training and other terms, conditions, and privileges of employment." 42 U.S.C. §12112(a).[25] Title III, on the other hand, covers discriminatory acts that prevent disabled individuals from accessing "goods, services, facilities, privileges, advantages, or accommodations" found in "a place of public accommodation."[26]

"Terms and conditions of employment are covered under Title I, not Title III." Ford v. Schering-Plough Corp., 145 F.3d 601, 612 (3d Cir. 1998). The Third Circuit explained in Menkowitz v. Pottstown Memorial Medical Center that "it is evident that Congress sought to regulate disability discrimination in the area of employment exclusively through Title I, notwithstanding the broad language of Title III." 154 F.3d 113, 118-19 (3d Cir. 1998). The key to determining whether a claim falls under Title I or under Title III is whether the benefits received have a "nexus" to the place of public accommodation or whether they are related to the person's employment. See Ford, 145 F.3d at 612-13.

Title I clearly applies in this case. But for the employee-employer relationship, Dr. Kortyna and Lafayette would not be connected. The disciplinary hearing relates to the

---

[25] Title I specifically states:
> No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C.A. § 12112(a).

[26] Title III of the ADA states:
> No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.

42 U.S.C. § 12182(a).

terms and conditions of his employment as a professor, as outlined in the Faculty

Handbook. The alleged discrimination relates to a policy that deals with the possible

"discharge" of the plaintiff, falling squarely within the language of Title I.[27] The ADA's

Title I non-discrimination provisions cover "all aspects of the employment process,

including disciplinary actions." EEOC Title I Technical Assistance Manual (TAM) at I-4;

see also § 7.7.[28] As the Third Circuit explained in Menkowitz, "Congress did not intend

Title III—despite the breadth of its language—to govern discrimination within the

employment setting and we cannot construe Title III in a manner that would eviscerate

such a salient legislative mandate." 154 F.3d at 119.[29]

      The plaintiff argues that he may bring his claim under both Title I and Title III. He

cites Fletcher v. Tufts Univ., 367 F. Supp. 2d 99, 115 (D. Mass. 2005), and Carparts

Distrib. Ctr. v. Auto. Wholesaler's Ass'n, 37 F.3d 12 (1st Cir. 1994), to support this point.

Precedent undercuts the plaintiff's argument. As Conners v. Maine Medical Center

---

[27] As the plaintiff even admits "[t]he result of this hearing…may result in his dismissal and the end of his career." See First Am. Compl., Doc. No. 11 at ¶ 68.

[28] See also The Americans With Disabilities Act: Applying Performance and Conduct Standards to Employees With Disabilities, EEOC, September 3, 2008, available at http://www.eeoc.gov/facts/performance-conduct.html ("15. Does an employer have to provide a reasonable accommodation to an employee with a disability who needs one to discuss a performance or conduct problem?" with answer).

[29] Courts have also rejected similar arguments under ADA Title II. See, e.g., Koslow v. Commonwealth of Pa., 158 F. Supp. 2d 539, 542 (E.D. Pa. 2001)("I am convinced that Congress intended Title I to be the sole avenue for pursuing employment discrimination claims based on disability. Title I expressly deals with employment discrimination, while Title II deals with "'services, programs, or activities of a public entity,'" 42 U.S.C. § 12132, and "'where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.'")(aff'd in part, rev'd in part on different grounds by Koslow v. Commonwealth of Pa., 302 F.3d 161 (3d Cir. 2002)); Coleman v. Pennsylvania State Police, No. 11–1457, 2013 WL 3776928, at *26 (W.D. Pa. Jul. 17, 2013)(" Congress did not intend Title II of the ADA to create a private right of action for individuals pursuing employment discrimination.")(citations omitted); Elwell v. Okla. ex rel. Bd. of Regents of Univ. of Okla., 693 F.3d 1303, 1306 n. 1, 1306-09, 1314  (10th Cir. 2012),  cert. denied, 133 S. Ct. 1255 (2013)("All this strongly suggests that Title I, not Title II, is the proper tool for pursuing employment discrimination claims….The Third and Sixth Circuits, too, have expressed the view that Title I is the exclusive province of employment discrimination within the ADA….").

explains (a case to which the plaintiff also cites for this point), the Third Circuit and First Circuit disagree about the applicability of Title III in certain employment-related disputes. 42 F.Supp.2d 34, 46 (D. Me. 1999). In <u>Ford</u>, the Third Circuit specifically rejected the reasoning in <u>Carparts</u> and, instead, adopted the reasoning from the Sixth Circuit's <u>Parker v. Metropolitan Life Ins. Co.</u>, 99 F.3d 181 (6th Cir.1996). <u>Ford</u>, 145 F.3d at 613-14 ("We also note that, by aligning ourselves with the Sixth Circuit's <u>Parker</u> decision regarding the definition of 'public accommodation[,]' we part company with the First Circuit in this regard.").

The plaintiff also cites to Judge Buckwalter's decision in <u>DeWyer v. Temple University</u> as support for this argument. No. CIV.A.00–CV–1665, 2001 WL 115461 (E.D. Pa. Feb. 5, 2001). While it is true that Judge Buckwalter acknowledged that there may be a situation in which a plaintiff could bring both a Title I and Title III claim, he explained that the plaintiff in that hypothetical scenario would need to show both that she was seeking an accommodation related to her employment <u>and</u> would need to show that she was seeking "another benefit or privilege that is unrelated to her employment but is directly connected to her employer's physical place, thus satisfying the <u>Ford</u> nexus test without implicating her employment relationship with her employer, which would force her claim back to the ambit of Title I." <u>Id.</u> at *3. This is not such a scenario. The plaintiff's right to a disciplinary hearing on charges of misconduct derives from his employment relationship with Lafayette, not from some other relationship between the

parties (i.e. one in which he is both a student at the university and a professor).[30] Like

Judge Buckwalter in <u>DeWyer</u>, I agree that "[t]o find Title III applicable in this case

would be to ignore Congress' attempt to carve out specific legislation to govern disability

discrimination in the employment context." <u>Id.</u>

    The plaintiff argues that the claim falls under Title III because the accommodation

involves a "modification of policies."[31] The plaintiff points to 42 U.S.C. §

12182(b)(2)(A)(ii) as support for his argument that the modification of a policy—which

is divorced from access to place—is appropriate under Title III.[32] This argument has no

---

[30] <u>See</u> <u>Long v. Howard Univ.</u>, 439 F. Supp. 2d 68 (D.D.C. 2006)(potential violation under Title III when Ph.D. student claimed university did not make reasonable accommodations to allow him to finish his degree).

[31] <u>Id.</u>

[32] <u>See</u> Plaintiff's Brief in Opposition to Defendants' Motion to Dismiss, Doc. No. 19 at 12.The portion of Title III, to which the plaintiff cites, states:
  2) Specific prohibitions
    (A) Discrimination
      *For purposes of subsection (a) of this section,* discrimination includes--
      (i) the imposition or application of eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any goods, services, facilities, privileges, advantages, or accommodations, unless such criteria can be shown to be necessary for the provision of the goods, services, facilities, privileges, advantages, or accommodations being offered;

      (ii) a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations;

      (iii) a failure to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services, unless the entity can demonstrate that taking such steps would fundamentally alter the nature of the good, service, facility, privilege, advantage, or accommodation being offered or would result in an undue burden;

      (iv) a failure to remove architectural barriers, and communication barriers that are structural in nature, in existing facilities, and transportation barriers in existing vehicles and rail passenger cars used by an establishment for transporting individuals (not including barriers that can only be removed through the retrofitting of vehicles or rail passenger cars by the installation of a hydraulic or other lift), where such removal is readily achievable….
42 U.S.C. § 12182(b)(2)(A)(i)-(iv)(emphasis added).

merit.[33] The plaintiff fails to explain that 42 U.S.C. § 12182(b)(2)(A)(ii) refers back to 42 U.S.C. § 12182(a), which requires some denial of access to "a place of public accommodation."[34] The Third Circuit has interpreted 42 U.S.C. § 12182(a) of Title III to exclude non-physical access. See Ford, 145 F.3d at 614("[P]ublic accommodation" does not refer to non-physical access."). The plaintiff admits that this suit "is not about physical access to a movie theater or a sidewalk, which Title III covers in its provisions on physical access to structures."[35]

The plaintiff also argues that Title I does not apply because "reasonable accommodation" as defined under that section does not list "access to a peripheral formal hearing process" as being one of these accommodations.[36] The definition is not exhaustive. The statute states that "[t]he term 'reasonable accommodation' *may* include" what is listed. See 42 U.S.C. §12111(9)(b) (emphasis added). Ford further undercuts this argument. In that case, the Third Circuit found that an employee's access to insurance

---

[33] The plaintiff also offers precedent from other circuits to support this argument. None of these cases is persuasive because none involve parties with established employer-employee relationships. See Dudley v. Hannaford Bros. Co., 333 F.3d 299, 312 (1st Cir. 2003)(finding that a store's policy to prohibit a customer access as a result of effects of her disability offends Title III); Lentini v. Cal. Ctr. for the Arts, 370 F.3d 837, 843-46 (9th Cir. 2004) (finding that the policy of arts center prohibiting service dogs violated Title III); Fortyune v. Am. Multi-Cinema, Inc., 364 F.3d 1075, 1087 (9th Cir. 2004) (affirming the district court's finding that a movie theater's failure to modify its seating policy provided a plausible claim under Title III of the ADA).

[34] The plaintiff also cites to 28 C.F.R. § 36.202, which mirrors the language in 42 U.S.C. § 12182(a). It states:
    (a) Denial of participation. A public accommodation shall not subject an individual or class of
    individuals on the basis of a disability or disabilities of such individual or class, directly, or
    through contractual, licensing, or other arrangements, to a denial of the opportunity of the
    individual or class to participate in or benefit from the goods, services, facilities, privileges,
    advantages, or accommodations of a place of public accommodation.
28 C.F.R. § 36.202.

[35] Plaintiff's Brief in Opposition to Defendants' Motion to Dismiss, Doc. No. 19 at 11.

[36] Id. at 7.

benefits would fall within the purview of Title I, not Title III. Accommodations related to employee insurance are not listed in 42 U.S.C. §12111(9)(b).

Lastly, the plaintiff offers several "analogous" cases in which Title III was applied: Menkowitz v. Pottstown Mem. Med. Ctr., 154 F.3d 113, 122 (3d Cir. 1998); PGA Tour, Inc. v. Martin, 532 U.S. 661 (2001); and Ault v. Walt Disney World Co., 692 F.3d 1212 (11th Cir. 2012). These cases are not helpful to the analysis because they do not involve parties engaged in an employer-employee relationship. In both PGA Tour, Inc. and Menkowitz, the disabled individuals were considered independent contractors, not employees, of the covered entities.[37] In Ault, the plaintiff in that case was clearly a customer of the defendant, and there was never a question of whether Title III or Title I applied.[38]

---

[37] In PGA Tour, Inc. v. Martin, the Supreme Court affirmed the Ninth Circuit's finding that the use of a golf cart by a disabled competitor in PGA tournaments would not fundamentally alter the nature of the PGA Tour's tournaments. 532 U.S. at 682-686. The PGA Tour argued in that case that Title I, not Title III, applied because the golfer's claim was "job-related." The Court did not specify whether this construction of the statute was correct but noted that Title I "does not apply because he is an independent contractor (as the District Court found) rather than an employee." Id. at 678. The Court also found that golf courses were places of public accommodations, which further bolsters the argument that Title III and not Title I applies. See id. at 681.

In Menkowitz, the Third Circuit found that Title III was applicable because the plaintiff did not allege he was an employee of the defendant but instead was more of an independent contractor. Id. at 122. Specifically, Menkowitz held that "a medical doctor with staff privileges one who is not an employee for purposes of Title I-may assert a cause of action under Title III of the ADA as an 'individual' who is denied the 'full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation.'" Id. at 122.

Other courts have found that the distinction of whether a person is an independent contractor versus an employee determines whether Title III can apply. See Hetz v. Aurora Med. Ctr. of Manitowoc County, No. 06-C-636, 2007 WL 1753428, at 14  (E.D. Wis. June 18, 2007) (denial of motion to dismiss Title III claim of doctor as independent contractor).

[38] See Ault, 692 F.3d at 1214 ("Mahala Ault, Stacie Rhea, and Dan Wallace … brought a class action suit against Disney on behalf of past and future Disney *customers* who have a mobility disability and rely upon a Segway® for mobility assistance.")(emphasis added).

Neither the alleged facts of this case nor the precedent in this Circuit support the plaintiff's Title III claim.[39] For these reasons, I will dismiss the plaintiff's ADA claim.[40]

### b. Section 504 of the Rehabilitation Act

#### i.      Exhaustion of Claims

The plaintiff also claims that Lafayette's prohibition against his lawyer representing him at the disciplinary hearing violates Section 504 of the Rehabilitation Act. Section 504 "bars both federal agencies and private entities that receive federal funding from discriminating on the basis of disability and is not limited to the employment context." Freed v. Consolidated Rail Corp., 201 F.3d 188, 190 (3d Cir. 2000).[41] Section 504 uses the same analysis as the ADA regarding the merits of a claim. 29 U.S.C. § 794(d).[42] However, the exhaustion requirement for each differs. In Freed v.

---

[39] The plaintiff argues that the question of whether the plaintiff's claim falls under Title I or Title III is a factual one which should not be decided at this stage. To support this argument, the plaintiff cites to Long v. Howard Univ., 439 F. Supp. 2d 68 (D.D.C. 2006). That case is not helpful. In Long, a Ph.D. candidate claimed that Howard University did not make reasonable accommodations to allow him to finish his degree. Id. at 70-73. There was no legal question in that case as to whether the plaintiff's claim fell under Title III or Title I because no employment relationship between the parties was alleged. The court denied summary judgment because factual disputes related to the Title III claim remained. Id. at 76. There is no question from the facts alleged that the relationship between Dr. Kortyna and Lafayette is anything other than an employee-employer relationship. The case law makes clear this relationship is covered by Title I. See also DeWyer v. Temple Univ.,  No. CIV.A.00–CV–1665, 2001 WL 115461, at *3 (E.D. Pa. Feb. 5, 2001)(dismissing claim under Title III because employee could not "appropriately characterize herself as a non-employee for the sake of qualifying under Title III as well as Title I").

[40] While the plaintiff may have a claim under Title I, the plaintiff has not exhausted his administrative remedies.

[41] Specifically Section 504 states:
> No otherwise qualified individual with a disability ... shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service.
29 U.S.C. § 794(a).

[42] See Fowler v. UPMC Shadyside, 578 F.3d 203, 208 (3d Cir. 2009)("The standards for determining whether a covered employer has violated § 794(d) have been coextensive with the standards for determining whether a covered employer has violated the ADA ever since [Section 504 was amended in 1992]."); Donahue v. Consolidated Rail Corp., 224 F.3d 226, 229 (3d Cir. 2000)("The elements of a claim under § 504(a) of the Rehabilitation Act are very similar to the elements of a claim under Title I of the Americans with Disabilities Act…."); Kralik v. Durbin, 130

Consolidated Rail Corp., the Third Circuit held that "section 504 plaintiffs may proceed directly to court without pursuing administrative remedies." 201 F.3d 188, 194 (3d Cir. 2000). See Burkhart v. Widener Univ., Inc., 70 Fed. Appx. 52, 53-54 (3d Cir. 2003) (affirming rule). While there appears to be some question of whether this same rationale applies to a Section 504 claim brought along with an ADA claim, I am bound to follow Freed as precedential.[43]

Although the plaintiff's Section 504 claim does not need to be exhausted, the plaintiff fails to state a claim under this Section, as I will explain below.

### ii.    Failure to State a Claim

The standards applied under Title I of the ADA are the standards "used to determine whether this section has been violated." 29 U.S.C. § 794(d).[44] An employer

---

F.3d 76, 80 (3d Cir. 1997)("[W]hile we will focus our analysis primarily on the ADA, our analysis in this case applies equally to her Rehabilitation Act claim.").

[43] In a non-precedential opinion after Freed, the Third Circuit noted that "[l]ike an ADA employment discrimination claimant, a § 504 claimant must also exhaust all administrative remedies in accordance with Title VII." Zankel v. Temple University, 245 Fed.Appx. 196, 199 n. 3 (3d Cir. Aug. 20, 2007). That case cited to Spence v. Straw, 54 F.3d 196, 201 (3d Cir.1995), which the Third Circuit found did not apply in Freed, without addressing Freed. See Freed, 201 F.3d at 192 ("The situation in Spence was far different than that presented here. Conrail is not a federal employer, but rather is the recipient of federal funding, and thus it can be sued for a violation of section 504 but not for a violation of section 501. Therefore, our concerns in Spence are not implicated here."). However, like other courts, I am bound to follow Freed as precedential. See Herring v. Chichester School District, No. 06-5525, 2007 WL 3287400, at *2-3 (E.D. Pa. Nov. 6, 2007); Luise v. Colonial Intermediate Unit 20, No. 13–cv–02626, 2014 WL 1225969, at *8 (E.D. Pa. Mar. 21, 2014).

[44] To make out a claim of discrimination under the Rehabilitation Act, Mr. Kortyna bears the burden of showing that: 1) he has a disability; 2) he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations; and 3) he was, nonetheless, otherwise prevented from performing the job. Donahue v. Consolidated Rail Corp., 224 F.3d 226, 229 (3d Cir. 2000)(quoting Shiring v. Runyon, 90 F.3d 827, 831 (3d Cir.1996)). The Third Circuit Court of Appeals has indicated that the McDonnell Douglas burden-shifting framework applies to ADA claims. See Shaner v. Synthes (USA), 204 F.3d 494, 500–501 (3d Cir. 2000).

For the purposes of this motion only, the parties agree that the plaintiff is disabled. See Defendants' Memorandum of Law in Support of their Motion to Dismiss Plaintiff's Amended Complaint, Doc. No. 8, Ex. 1 at 10 n. 5. Viewing the facts in the light most favorable to the plaintiff, he appears qualified to perform the essential functions of his job. The question at the heart of this claim is whether Lafayette failed to accommodate his disability.

violates Title I of the ADA if the employer does not make reasonable accommodations for a disabled employee's "known physical or mental limitations."[45] 42 U.S.C. § 12112(b)(5)(A).[46] "Reasonable accommodations" may include, among other things, "appropriate adjustment or modifications of examinations" or "the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities." 42 U.S.C. § 12111(9). Both an employer and employee "have a duty to assist in the search for appropriate reasonable accommodation and to act in good faith." Williams v. Philadelphia Housing Auth. Police Dep't., 380 F.3d 751, 771-72 (3d Cir. 2004)(quoting Mengine v. Runyon, 114 F.3d 415, 420 (3d Cir.1997)).

To state a claim that an employer breached this duty to accommodate, an employee must show that:

1) the employer knew about the employee's disability;

2) the employee requested accommodations or assistance for his or her disability;

3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and

---

[45] The defendants argue that the claims are unripe because the disciplinary hearing has not yet concluded. While most ADA claims involve some adverse employment action beyond just the failure to accommodate, termination, suspension, or disciplinary sanctions are not required for a claim to be brought under this theory. "Adverse employment decisions in [the ADA] context include refusing to make reasonable accommodations for a plaintiff's disabilities." Colwell v. Rite Aid Corp., 602 F.3d 495, 503 (3d Cir. 2010).

[46] The statute also requires that the employee is a "qualified individual" with a disability. 42 U.S.C. § 12112(b)(5)(A). A "qualified individual" is "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). A "disability" is defined by the ADA as: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2). Though the defendants make arguments indicating the plaintiff does not meet these definitions, the defendants have conceded that the plaintiff is a qualified individual with a disability for the purposes of this motion. See Defendants' Memorandum of Law in Support of their Motion to Dismiss Plaintiff's Amended Complaint, Doc. No. 8, Ex. 1 at 10 n. 5.

> 4) the employee could have been reasonably accommodated but for the employer's lack of good faith.

Williams, 380 F.3d at 772 (quoting Taylor v. Phoenixville School Dist., 184 F.3d 296, 319–20 (3d Cir. 1999)).[47]

From the facts alleged, Lafayette was aware of the plaintiff's disability. Dr. Kortyna requested accommodations for this disability prior to the disciplinary hearing. Lafayette modified the hearing as a result of this request. Lafayette only permitted the complaintants in the hearing during their own testimony because Dr. Kortyna's inability to function stemmed from his being in their presence.[48] After the first day of the hearing, Lafayette offered additional accommodations. Dr. Kortyna would be permitted to use written questions and statements, offered additional time to formulate questions and statements, would be allowed to write questions that his faculty advisor could read if Dr. Kortyna was unable to do so, and would be permitted to cross-examine the complaintants via video or other means.[49] These accommodations addressed the deficiencies in Dr. Kortyna's ability to function, which Dr. Weiss noted in his evaluation.[50] Dr. Weiss

---

[47] See also Stadtmiller v. Univ. of Pitts. Med. Ctr. Health Plan, Inc., 491 Fed. App'x. 334 (3d Cir. 2012).

[48] See First Am. Compl., Doc. No. 11 at 22 ("As you know, the Committee has already decided, based on its understanding of the outlined hearing procedures, that the Complaintants should not be in the hearing room except to present their testimony and answer questions."); First Am. Compl., Doc. No. 11, Ex. C.

[49] First Am. Compl., Doc. No. 11, Ex. C.

[50] The plaintiff argues that his claim should withstand a motion to dismiss because the question of whether offered accommodations are reasonable is one of fact. It is true that the question of reasonableness is a factual one. However, viewing the facts in the light most favorable to the plaintiff, no reasonable jury could find that the accommodations Lafayette proposed were not reasonable under the circumstances. See Williams, 380 F.3d at 772 (explaining how reasonableness is a question of fact but explaining that the failure to accommodate also requires a consideration of employer's good faith); Buskirk v. Apollo Metals, 307 F.3d 160, 170-71 (3d Cir. 2002)(explaining how question of fact regarding reasonableness can be decided by the court if no reasonable jury could have found employer did not reasonably accommodate).

specifically noted that the presence of the complainants may cause Dr. Kortyna to "become paralyzed by anxiety," preventing him from verbally expressing himself. [51] Dr. Weiss, however, explained that "[w]riting is something he can still do."[52]

The plaintiff alleges that his mental health diagnosis prevents him from effectively communicating during the disciplinary hearing. Under these conditions, he may need an "interpreter" of sorts—someone to help him communicate. [53] Lafayette has already offered Dr. Kortyna this type of accommodation. Lafayette was willing to allow his faculty counsel, who typically would remain silent during the disciplinary hearing, to present Dr. Kortyna's written questions on his behalf if he was unable to do so himself. Dr. Kortyna, however, wants a specific "interpreter" in the form of his attorney. This request is one which Lafayette can deny without being in violation of the ADA or Section 504. See Goldblatt v. Geiger, 867 F. Supp. 2d 201, 209-10 (D.N.H. 2012)(denial of plaintiff's request for a specific non-attorney advocate in family court as an accommodation for her post-traumatic stress disorder was not a violation of ADA).

---

In addition, the question of reasonableness is one that is determined when *both* parties engage in the interactive process to find accommodations. See Williams, 380 F.3d at 771-72. While Lafayette has done its part in trying to find a reasonable accommodation, the plaintiff has failed to respond to their proposed accommodations. Instead, he filed this lawsuit. His failure to engage in this interactive process would also preclude his claim. See Hill v. Walker, 737 F.3d 1209, 1218 (8th Cir. 2013); Smith v. Midland Brake, Inc., a Div. of Echlin, Inc., 180 F.3d 1154, 1173 (10th Cir. 1999)(explaining how a plaintiff's failure to engage in the interactive process can preclude his ADA claim).

[51] See id. ("Writing is something he can still do, he said, but the problem would be if he had to speak before a group that included the two students and others who had not yet been named. Though he was aware that he had the right to have peer counsel present, he was quite fearful that he would fall apart and not be able to direct questions at the accusers or to defend himself without feeling out of control.").

[52] See First Am. Compl., Doc. No. 11, Ex. A at 4 ("Writing is something he can still do, he said, but the problem would be if he had to speak before a group that included the two students and others who had not yet been named. Though he was aware that he had the right to have peer counsel present, he was quite fearful that he would fall apart and not be able to direct questions at the accusers or to defend himself without feeling out of control.").

[53] Dr. Weiss analogized Dr. Kortyna's request for his attorney to be present to an accommodation for "handicap access" or "sensory enhancement." See First Am. Compl., Doc. No. 11, Ex. A at 4.

The plaintiff contends that the accommodations Lafayette offered would constrain his presentation to a "robotic automaton role."[54] Dr. Weiss claims that Dr. Kortyna will not be able to function "at his best" in the disciplinary hearing as a result of his disability. As the Supreme Court has explained, "reasonable accommodations" permit "those with disabilities to obtain the same workplace *opportunities* that those without disabilities automatically enjoy." U.S. Airways, Inc. v. Barnett, 535 U.S. 391, 397 (2002)(emphasis added). They do not ensure that disabled individuals have the same *results* as those who are non-disabled.[55] Other faculty accused of sexual harassment are not permitted to have their private attorneys represent them. Dr. Kortyna's disability does not require that he be afforded this privilege, which other faculty members do not enjoy.

Even viewing these facts in the light most favorable to him, Dr. Kortyna has failed to show a lack of good faith by Lafayette, which is necessary to make out a failure to accommodate claim.[56] While Lafayette did not grant him the accommodation he requested, Lafayette has made a good-faith effort to accommodate for his disability.[57] "All the interactive process requires is that employers make a good-faith effort to seek

---

[54] See First Am. Compl., Doc. No. 11 at ¶ 67.

[55] See EEOC Title I Technical Assistance Manual (TAM) at § 3.4, available at http://askjan.org/links/adatam1.html ("A reasonable accommodation must be an effective accommodation. It must provide an opportunity for a person with a disability to achieve the same level of performance or to enjoy benefits or privileges equal to those of an average similarly-situated non-disabled person. However, the accommodation does not have to ensure equal results or provide exactly the same benefits or privileges.").

[56] Dr. Kortyna has also failed to plausibly allege that the advocacy of his private lawyer at the hearing would be the *only* effective accommodation. This is required to make out a *prima facie* case under this rubric.

[57] An employer's good faith effort to identify and provide an accommodation provides a complete statutory defense to damages. 42 U.S.C. § 1981a(a)(3).

accommodations."[58] Hohider v. United Parcel Service, Inc., 574 F.3d 169, 187 (3d Cir.

2009)(quoting Taylor, 184 F.3d at 317). "An employer is not obligated to provide an

employee the accommodation he requests or prefers, the employer need only provide

some reasonable accommodation."[59] Yovtcheva v. City of Philadelphia Water Dept., 518

Fed.Appx. 116, 122 (3d Cir. May 7, 2013)(quoting Gile v. United Airlines, Inc., 95 F.3d

492, 499 (7th Cir.1996)).[60] "The ADA mandates reasonable accommodation of people

with disabilities in order to put them on an even playing field with the non-disabled; it

does not authorize a preference for disabled people generally." Felix v. N.Y.C. Transit

Auth., 324 F.3d 102, 107 (2d Cir. 2003)(citing U.S. Airways, Inc. v. Barnett, 535 U.S.

139, 397 (2002)).[61]

---

[58] See also Beck v. Univ. of Wisconsin Bd. of Regents, 75 F.3d 1130, 1137 (7th Cir. 1996)("Liability for failure to provide reasonable accommodations ensues only where the employer bears responsibility for the breakdown. But where, as here, the employer does not obstruct the process, but instead makes reasonable efforts both to communicate with the employee and provide accommodations based on the information it possessed, ADA liability simply does not follow.").

[59] The EEOC has explained that an employer only needs to provide an effective accommodation. "If more than one accommodation would be effective for the individual with a disability, or if the individual would prefer to provide his or her own accommodation, the individual's preference should be given first consideration. However, the employer is free to choose among effective accommodations, and may choose one that is less expensive or easier to provide." EEOC Title I Technical Assistance Manual (TAM) at § 3.8, available at http://askjan.org/links/adatam1.html.

[60] See also Hohider v. United Parcel Service, Inc., 574 F.3d 169, 187 (3d Cir. 2009); Tucker v. Tennessee, 539 F.3d 526, 541 (6th Cir. 2008) ("[A court] is not required to meet [a disabled person's] exact requests. What is required by the ADA . . . is an alternative which allows disabled persons to communicate as effectively as a non-disabled person."); Santacrose v. CSX Transp., Inc., 288 Fed. App'x 655, 657 (11th Cir. 2008) ("While [plaintiff] was not given the precise accommodation he requested . . ., a qualified individual with a disability is not entitled to the accommodation of his choice, but only to a reasonable accommodation."); Goldblatt v. Geiger, 867 F. Supp. 2d 201, 209-10 (D.N.H. 2012)(denial of plaintiff's request for a specific non-attorney advocate in family court as an accommodation for her post-traumatic stress disorder was not a violation of ADA).

[61] See also Filar v. Bd. of Educ. of Chicago, 526 F.3d 1054, 1067-68 (7th Cir. 2008) (substitute teacher was not entitled to be assigned to particular schools, instead of being assigned wherever she was needed, because this "would have amounted to preferential treatment, which the ADA does not require."); Krikelis v. Vassar College, 581 F.Supp.2d 476, 486-87 (S.D.N.Y. 2008)(finding that employer not required to grant diabetic employee's request for a "full break" to eat at a specified time when she was permitted to eat a "quick bite" at that time and did not engage in the interactive process of determining a reasonable accommodation).

For this reason, the plaintiff has failed to state a claim on which relief can be granted. [62] I will dismiss his Section 504 claim as well.[63]

### c.  IIED Claim against Provost Hill

In addition to his claims against the College, the plaintiff also asserts an IIED claim against the former Provost Wendy Hill for her role in prosecuting the allegations against him. In the complaint, Dr. Kortyna claims that student W's complaint "did not fit within the Faculty Handbook's definition of sexual harassment" and argues his case in

---

[62] The EEOC has explained that:
> An individual with a disability is not required to accept an accommodation, aid, service, opportunity or benefit which such qualified individual chooses not to accept. However, if such individual rejects a reasonable accommodation, aid, service, opportunity or benefit that is necessary to enable the individual to perform the essential functions of the position held or desired, and cannot, as a result of that rejection, perform the essential functions of the position, the individual will not be considered qualified.

29 C.F.R. § 1630.9(d).

When an employee refuses to take advantage of a reasonable accommodation made available to him by the employer after this interactive process, the employee is not a "qualified individual" under the ADA. Yovtcheva, 518 Fed.Appx. at 121(discussing 29 C.F.R. § 1630.9(d)). For this reason too, Dr. Kortyna's claim would fail.

[63] Even if the plaintiff had made out a claim under a *prima facie* case of discrimination under the ADA for failure to accommodate, Lafayette could then show, as an affirmative defense, that the requested accommodation is unreasonable or imposes an "undue hardship." 42 U.S.C. § 12112(b)(5)(A). "The test to determine the reasonableness of a modification is whether it alters the essential nature of the program or imposes an undue burden or hardship in light of the overall program." Easley by Easley v. Snider, 36 F.3d 297, 305 (3d Cir. 1994)(citations omitted). The following factors should be considered: the nature and cost of the accommodation, the effect on expenses and resources, and the impact of the accommodation on the operation of the facility. 42 U.S.C. § 12111(10)(B).

Though this test is factually based and would be one less likely to be determined at the motion to dismiss stage, Lafayette offers seemingly strong evidence that allowing the plaintiff to have an attorney as his advocate could set a bad precedent, which could spill over into future disciplinary proceedings and other types of proceedings at the college. Involving attorneys in the school's internal disciplinary procedures could further complicate the school's disciplinary procedures and encourage parties to "lawyer up." Having lawyers present at these proceedings could also intimidate students who are testifying against faculty. As the College argues, cross-examination of the students by a trained attorney poses a real risk of further victimization of students who may have been sexually harassed by a professor. Given that the school's internal administrative procedures allow for appeals and mistakes to be corrected, the presence of counsel at such proceedings does not appear to be necessary.

26

this regard.[64] Provost Hill's decision to refer the complaint for a disciplinary hearing, despite its "obvious insufficiency," is the basis for the plaintiff's IIED claim.[65]

The defendant argues that this claim is barred by the Pennsylvania Workers' Compensation ACT (WCA). In Pennsylvania, the WCA provides the exclusive remedy for employee work-related injuries. See 77 P.S. § 481(a); Matczak v. Frankford Candy & Chocolate Co., 136 F.3d 933, 940 (3d Cir. 1997).[66] The statute, however, provides that "'injury arising in the course of employment'… shall not include an injury caused by the act of a third person intended to injure the employee because of reasons personal to him, and not directed against him as an employee or because of his employment." 77 Pa. Const. Stat. Ann. § 411(1). This carve-out has come to be known as the "third-party attack" or "personal animus" exception.[67] This "personal animus" exception is typically available in only limited circumstances. DeWyer,  2001 WL 115461 at *5.

"[T]he critical inquiry in determining the applicability of the third-party attack exception is whether the attack was motivated by personal reasons, as opposed to generalized contempt or hatred, and was sufficiently unrelated to the work situation so as

---

[64] See First Am. Compl., Doc. No. 11 at ¶ 49.

[65] See id. at ¶ 53.

[66] See also DeWyer, 2001 WL 115461 at *5.

[67] See id.; Schweitzer v. Rockwell Intern., 586 A.2d 383, 391 (Pa. Super. 1990)("If it is determined that an injury to an employee is 'caused by an act of a third person intended to injure the employee because of reasons personal to him and not directed against him as an employee or because of his employment,' 77 P.S. § 411(1), liability for the injury is not covered by 77 P.S. § 481, the exclusive remedy provision of the Workmen's Compensation Act."); Krasevic v. Goodwill Indus. of Central Pennsylvania, Inc., 764 A.2d 561, 565 (Pa. Super. 2000)("Thus, the key to the application of the third party attack exception is the determination, in the context of a given case, that an attack derives from 'purely personal reasons,' reasons 'purely personal to the assailant,' rather than from some work-related cause.").

not to arise out of the employment relationship." Fugarino v. University Servs., 123 F.Supp.2d 838, 844 (E.D. Pa. 2000). The plaintiff alleges that "there had been tension and disagreement between Andrew Kortyna and Provost Wendy Hill over a number of Lafayette College administrative and academic issues, as to which the Provost strongly expressed opposition to Andrew Kortyna" for a number of years "as well as personal animus."[68] The "tension and disagreement" described in the complaint would be considered work-related and, therefore, would not fall within the "personal animus" exception. While the plaintiff claims that the prosecution of the harassment charges against him was motivated by Hill's personal animus against him, he offers no allegations or facts to support this conclusory statement. The plaintiff also alleges that Provost Hill selectively prosecuted other issues of sexual misconduct by faculty and staff; however, this statement too is unsupported by specific facts. Without any factual allegations to support the personal animus exception, the IIED claim should be dismissed as precluded under the WCA. See Twombly, 550 U.S. at 555.

Even if the WCA did not preclude the IIED claim, it would still fail. To make out a claim for IIED, a plaintiff must show that the defendant's behavior was "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." Cox v. Keystone Carbon Co., 861 F.2d 390, 395 (3d Cir. 1988)(quoting Buczek v. First National

---

[68] See First Am. Compl., Doc. No. 11 at ¶ 21.

Bank of Mifflintown, 531 A.2d 1122, 1125 (Pa. Super. 1987)(quotation marks omitted).[69]

"[I]t is extremely rare to find conduct in the employment context that will rise to the level

of outrageousness necessary to provide a basis for recovery for the tort of intentional

infliction of emotional distress." Cox, 861 F.2d at 395.[70] "It is the court's responsibility to

determine if the conduct alleged in a cause of action reaches the requisite level of

outrageousness." Andrews v. City of Philadelphia, 895 F.2d 1469 (3d Cir. 1990)(citing

Cox, 861 F.2d at 395). When a complaint does not allege the requisite "outrageous

conduct," it may be dismissed.[71]

The plaintiff has offered no facts to support the claim that Provost Hill's behavior

was "so outrageous" to warrant relief. Provost Hill was required to take student

complaints regarding sexual harassment complaints against faculty, as outlined in

Lafayette's procedures. [72] She was also responsible for conducting an investigation of the

---

[69] See also Clark v. Township of Falls, 890 F.2d 611, 623 (3d Cir.1989) ("Under Pennsylvania law, courts have found intentional infliction of emotional distress only where the conduct at issue has been 'atrocious' and 'utterly intolerable in a civilized community.'"); Hoy v. Angelone, 691 A.2d 476, 482 (Pa. Super. 1997)("While our courts recognize a cause of action for intentional infliction of emotional distress, we have allowed recovery in only very egregious cases."); Hampton v. Tokai Fin. Servs., Inc., No. CIV.A. 98–5074, 1999 WL 83934, at *3 (E.D.Pa. Feb.18, 1999) (explaining that conduct arising in the employment context "will rarely rise to the level of outrageousness necessary to support an [IIED] claim")(citing Cox, 861 F.2d at 390).

[70] See also Matczak, 136 F.3d at 940("We have noted that 'it is extremely rare to find conduct in the employment context that will rise to the level of outrageousness necessary to provide a basis for recovery for the tort of intentional infliction of emotional distress.'")(quoting Cox, 861 F.2d at 395).

Viable IIED claims in the employment context have only been found when the claims involved both sexual harassment and other retaliatory behavior against an employee. Cox, 861 F.2d at 395(citing Bowersox v. P.H. Glatfelter Co., 677 F.Supp. 307, 311 (M.D. Pa. 1988)).

[71] See, e.g., N'Jai v. Pittsburgh Bd. of Public Educ., 487 Fed.Appx. 735, 738 (3d Cir. Jun. 6, 2012)(citing Cox, 861 F.2d at 395; Buczek, 531 A.2d at 1125; Fugarino, 123 F.Supp.2d at 844-45 (dismissing IIED claim because of failure to plead behavior was "so outrageous"); DeWyer, 2001 WL 115461 at *6.

[72] See First Am. Compl., Doc. No. 11, Ex. B at 130 (Lafayette College Policies on Sexual Assault and Sexual Harassment)("Allegations against members of the Faculty should be made to the Provost. In addition, allegations arising out of the teaching role of any instructor of a course should similarly be made to the Provost.").

complaints, according to the procedures.[73] The alleged actions that Provost Hill took as part of his investigation were in line with what was required by the sexual harassment procedure. Even viewing the facts in the light most favorable to the plaintiff, there is nothing in the complaint's allegations that even close to being "outrageous," "atrocious," or "extreme" in her behavior.

For these reasons, I will dismiss the plaintiff's IIED claim.

## IV.    CONCLUSION

For the foregoing reasons, I will grant the defendants' motion to dismiss in its entirety.

---

[73] Id. at 130, 132.